*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

TIMOTHY BENNETT, also known as TIMOTHY BENNET, Personal Representative of the ESTATE OF CREE ERWIN-SHEPPARD,

      Plaintiff-Appellant,

and

NORMAN H. ERWIN,

      Plaintiff

v

SOUTHWESTERN MICHIGAN EMERGENCY SERVICES, PC, DEVIN J. WOELZLEIN, M.D., BRONSON BATTLE CREEK HOSPITAL, LAURA CASTLEMAN, M.D., PLANNED PARENTHOOD OF MICHIGAN, doing business as KALAMAZOO HEALTH CENTER, ENZO ANTHONY CENTO, M.D.,

      Defendants-Appellees,

and

ADVANCED RADIOLOGY SERVICES, PC,

      Defendant.

UNPUBLISHED
August 04, 2026
1:55 PM

No. 373621
Kalamazoo Circuit Court
LC No. 2021-000135-NH

---

Before: ACKERMAN, P.J., and REDFORD and FEENEY, JJ.

PER CURIAM.

In this medical-malpractice action, plaintiff-appellant,[1] Timothy Bennett, also known as Timothy Bennet, personal representative of the Estate of Cree Erwin-Sheppard, appeals as of right the circuit court order granting summary disposition in favor of defendants-appellees, Bronson Battle Creek Hospital (Bronson Hospital), Southwestern Michigan Emergency Services, PC (SMES), and Devin J. Woelzlein, M.D. Plaintiff also challenges the circuit court's previous orders, granting summary disposition in favor of defendants-appellees, Laura Castleman, M.D.; Planned Parenthood of Michigan, doing business as Kalamazoo Health Center (Planned Parenthood); Enzo Anthony Cento, M.D.; and Advanced Radiology Services, PC (ARS). We reverse the trial court's orders granting summary disposition in favor of defendants-appellees, and we remand for further proceedings consistent with this opinion.

I. FACTS

This case arises out of the death of Cree Erwin-Sheppard (the decedent), a 24-year-old woman, who died mere days after undergoing an elective abortion and intrauterine contraceptive device (commonly referred to as an IUC or IUD) placement at Planned Parenthood.

On June 30, 2016, the decedent, at 12 weeks' gestation, presented to Planned Parenthood for an elective abortion, which Dr. Laura Castleman performed. During that same visit, the decedent also underwent an IUD placement. Although the decedent experienced pain with the procedure, Planned Parenthood records indicate that the procedure was "completed without complication," and the decedent "was discharged in good condition" after tolerating snacks and fluids and reduction in post-procedure pain. Experts later opined that the decedent suffered a uterine perforation during her procedure at Planned Parenthood.

On the evening of July 2, 2016, the decedent arrived at Bronson Hospital "complaining of constant and severe lower abdominal pain since the abortion procedure 2 days prior, and nausea and vomiting." Dr. Woelzlein was the emergency medicine physician who treated the decedent. Dr. Woelzlein: (1) administered intravenous (IV) fluids, anti-nausea medication, and pain medication; (2) performed a pelvic examination, which revealed "a 'scant amount of vaginal blood in vaginal vault. No clots' "; and (3) ordered lab work and an ultrasound, "with transvaginal if necessary." A transabdominal ultrasound was performed, which Dr. Cento interpreted, concluding that there was "[a]bnormal thickening and heterogeneity of the endometrial cavity due to the presence of clot and/or retained products of conception." A transvaginal ultrasound was not performed. Dr. Woelzlein ultimately diagnosed the decedent with an "incomplete miscarriage and pelvic pain." At approximately 12:35 a.m. on July 3, 2016, Dr. Woelzlein discharged the decedent from the hospital with: (1) prescriptions for pain (Norco) and anti-nausea (Zofran) medications, and (2) instructions to follow up with her primary care physician or Planned Parenthood in three days, "after the holiday weekend." The decedent was "stable," no longer actively vomiting, and agreeable to the entire treatment plan when she was discharged; however, she communicated that her pain level measured a 7 out of 10 at that time.

---

[1] Any reference to "plaintiff" in this opinion is to plaintiff-appellant, not the additional plaintiff, Norman H. Erwin.

At approximately 12:30 a.m. on July 4, 2016, the decedent's mother found her unconscious and unresponsive in her mother's bedroom. Dr. Elizabeth Douglas, a deputy medical examiner, performed the decedent's autopsy, determining that the decedent's manner of death was an accident, and her cause of death was "[c]omplications of intrauterine pregnancy including pulmonary emboli related to uterine vein thrombosis and uterine perforation status post early vacuum aspiration and intrauterine contraception placement." Multiple expert witnesses provided deposition testimony regarding the decedent's cause of death.

In 2021, plaintiff filed a complaint against defendants, jointly and severally, alleging that the decedent died as a result of defendants' failure to follow the applicable standard of care during her treatment. Thereafter, each defendant moved for summary disposition, arguing that plaintiff could not prove causation. Plaintiff's general theory was that compliance with the applicable standards of care would have led to timely recognition and treatment of the uterine perforation and its thrombotic complications, more probably than not preventing the decedent's pulmonary embolism and death. Conversely, defendants generally contended that: (1) even if the decedent's uterine vein thrombosis had developed by the time that she was in the hospital, a transvaginal ultrasound may not have detected it; (2) plaintiff had not offered any evidence to establish that the alleged standards of care would have resulted in detection of the decedent's lower extremity deep vein thrombosis; and (3) plaintiff failed to establish that defendants' compliance with the alleged standards of care would have altered the ultimate outcome, i.e., the decedent's death by pulmonary embolism.

The circuit court granted summary disposition in favor of each defendant. The circuit court reasoned that no expert could definitively identify the source of the decedent's pulmonary emboli that caused her death: the decedent's uterine veins or lower extremities. The circuit court explained that even if the decedent's uterine vein thrombosis had developed by the time that she was in the hospital, and a transvaginal ultrasound had been ordered, expert testimony established that her uterine vein thrombosis may not have been detected. Moreover, the trial court found that plaintiff failed to present any testimony stating that application of plaintiff's proposed standard of care could have identified the decedent's lower extremity deep vein thrombosis. Plaintiff now appeals.

## II. SUMMARY DISPOSITION

On appeal, plaintiff argues that the trial court erred by granting summary disposition to each defendant because plaintiff's experts created a genuine issue of material fact as to causation. We agree.

## A. PRESERVATION AND STANDARD OF REVIEW

Because this issue was raised, addressed, and decided by the circuit court through defendants' motions for summary disposition, it is preserved for appellate review. See *George v Allstate Ins Co*, 329 Mich App 448, 453; 942 NW2d 628 (2019).

"We review de novo a trial court's decision on a motion for summary disposition, reviewing the record in the same manner as must the trial court to determine whether the movant was entitled to judgment as a matter of law." *Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 440; 814 NW2d 670 (2012). Our review is limited to the evidence presented to

the trial court at the time the motion was decided. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009). "To the extent this matter presents questions concerning the proper interpretation of contractual or statutory language, our review is also de novo." *Dobbelaere v Auto-Owners Ins Co*, 275 Mich App 527, 529; 740 NW2d 503 (2007).

Although Dr. Castleman and Planned Parenthood moved for summary disposition under MCR 2.116(C)(8) and (10), the circuit court clearly granted summary disposition to all defendants under MCR 2.116(C)(10). MCR 2.116(C)(10) provides that the trial court may grant summary disposition in favor of the moving party when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Id*. at 270-271 (quotation marks and citation omitted). "A trial court may not assess credibility, weigh the evidence, or resolve factual disputes, and when material evidence conflicts, it is not appropriate for the court to grant the motion for summary disposition." *Cetera v Mileto*, 342 Mich App 441, 448; 995 NW2d 838 (2022).

## B. ANALYSIS

"A plaintiff in a medical malpractice action must establish (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016) (quotation marks and citation omitted). "Generally, expert testimony is required in a malpractice case in order to establish the applicable standard of care and to demonstrate that the professional breached that standard." *Id*. (quotation marks and citation omitted).

In this case, the circuit court granted summary disposition in defendants' favor on the basis that plaintiff failed to prove causation.

"In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." MCL 600.2912a(2). " 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Taylor v Kent Radiology*, 286 Mich App 490, 511; 780 NW2d 900 (2009) (quotation marks and citation omitted). "In order to establish that a particular action was the cause in fact of an injury, the plaintiff must show that but for the defendant's actions, the plaintiff's injury would not have occurred." *Id*. (quotation marks and citation omitted). "Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation." *Robins v Garg*, 276 Mich App 351, 362; 741 NW2d 49 (2007). "All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty." *Id*. (quotation marks and citation omitted). Accordingly, "[s]ummary disposition is not appropriate when the plaintiff offers evidence that

-4-

shows that it is more likely than not that, but for defendant's conduct, a different result would have obtained." *Id*. (quotation marks and citation omitted).

We conclude that there were genuine issues of material fact on the question of causation and that the trial court erred in granting defendants-appellees summary disposition on this ground. The trial court's determination rests on the conclusion that causation cannot be established because the precise origin of the fatal emboli cannot be known. But plaintiff was not required to identify a particular clot and then trace that clot's progression through the decedent's body. Instead, plaintiff only needed to establish "a reasonable likelihood of probability" and "a fair amount of certainty." *Id*. (quotation marks and citation omitted). Viewed in the light most favorable to plaintiff, the expert testimony permitted a reasonable jury to find that timely recognition of the uterine perforation and resulting treatment more probably than not would have prevented the fatal pulmonary embolism, regardless of the precise origin of the thrombi.[2] Accordingly, the record raises a triable issue.

We reverse the trial court's orders granting summary disposition in favor of defendants-

---

[2] For example, plaintiff's OB/GYN expert, Dr. Jeffrey Soffer, testified that the decedent's uterine perforation should have been recognized at Planned Parenthood, and once it was recognized, the decedent should have been admitted for observation or surgery. Moreover, once it was determined that the perforation was "rather large" and needed to be repaired, an operation should have been conducted, during which "they certainly would have attended to the thrombosis that was in [the decedent's] uterine vein." Dr. Soffer explained that "[t]hey could have ligated that, put her on blood thinners, and ultimately avoided her having died from a pulmonary embolism."

Plaintiff's emergency-medicine expert, Dr. Galan, also testified that, more likely than not, the decedent's outcome would have been different had Dr. Woelzlein administered heparin while she was in the emergency department. Dr. Galan explained: "Because Ms. Sheppard did not have a pulmonary embolus in the Emergency Department. The heparin would have prevented a pulmonary embolus." This testimony permitted a reasonable inference that timely anticoagulation would have prevented the fatal embolism regardless of the precise origin of the thrombi.

Additionally, plaintiff's pathology expert, Dr. Daniel Spitz, testified that "but for the uterine perforation and but for her being sick, she doesn't develop venous thrombi and she doesn't have the pulmonary emboli." Similarly, plaintiff's radiology expert, Dr. Randall Patten, opined that "had Dr. Cento complied with the standard of care and timely diagnosed the abnormality of the uterus and basically, you know, raised the possibility of uterine perforation, that there would have been a referral or care provided by a surgeon, OB-GYN, whatever." Although Dr. Patten declined to offer a causation opinion beyond the point of referral or surgical care, the testimony of other experts supplied evidence that appropriate treatment following referral more probably than not would have prevented the fatal embolism. Moreover, Dr. Woelzlein himself answered "presumably, yes" when asked whether the decedent would have "likely survived and not died" had an OB/GYN been consulted and diagnosed the perforation.

appellees, and we remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Matthew S. Ackerman
/s/ James Robert Redford
/s/ Kathleen A. Feeney